1579, Inouye Peter Kite and David Hatton, Mr. Mukai. Good morning, Your Honors. May it please the Court. Today we are considering an important invention that will have a significant impact not only on hospitals but on all health care providers. The present invention relates to a serious problem of infection caused by contamination of conduits, particularly catheters. In hospitals and other medical environments, catheters can provide life-sustaining assistance to patients. Yet, they provide an excellent environment for bacterial growth. And catheter-related infection has been recognized in the art. In fact, it's mentioned specifically in the Root article, which is the primary reference, and is known to cause thousands of deaths a year. The present invention addresses this challenge in the art and provides a method for disinfecting a conduit, particularly a catheter. When considering the disinfection of a catheter, there was a world of difference between inhibition of bacterial growth and bactericidal effect across a broad spectrum of bacteria. If you do not kill... Is that a difference in kind or a difference in degree? No, it's a difference in kind, Your Honor. Why is that? Because this is not a static situation. This is not a situation where some or almost all is enough. If you do not kill all the bacteria that is in the catheter, what will happen is the bacteria in the catheter propagate at an extremely rapid rate, an average of doubling every 20 minutes. And as a result, in a very simply short period of time... In both situations, the agent that is affecting the reduction of bacteria, the bactericidal agent, is either working fully to completely eliminate the bacteria or working only partially so that the mechanism is the same. Whether the agent serves the function of killing bacteria or not is the same. It's just a difference in degree, correct? Well, I respectfully disagree with you, Your Honor, because if you do not kill all that bacteria, as I've mentioned, the residual bacteria will propagate and propagate rapidly and will overwhelm the catheter in time. I understand that. I understand that. What I'm getting at is if a particular chemical has a particular effect in killing bacteria, whether it completely kills the bacteria or only partially kills the bacteria, nonetheless, it's killing bacteria. It is killing bacteria. That is correct. And so you have, in this case, you have one reference that suggests that this problem with catheters can be solved by using, I guess, a disodium EDTA. That's the root reference. And then you have the rad reference that discloses tetrasodium EDTA. The question is why is it not, why would it have not been obvious, one of ordinary skill in the art, to simply take the tetrasodium EDTA of rad and use it for a catheter as shown in Root? Well, there are several reasons, Your Honor. First of all, Root does not say that disodium EDTA is the solution to everything. What it says is that we should investigate this further as a substitute for heparin. And heparin has no bacterial side elements. So is some better than none? Of course it is. But that does not take us to the end result. The end result is you have to safeguard the safety of the patient. And the only way you're going to safeguard the patient is to kill all the bacteria that's in the catheter and in the culture surrounding it. If you don't do that, the patient's in trouble. And we're not saying that we only kill some. Our claims say bacterial side effect across a broad spectrum of bacteria. Root only addresses one type of bacteria. And in fact, Root says that when you go from 10 to the 3 CFU per milliliter, which is a very, very modest challenge, to the more rigorous of 10 to the 5th CFU, and our experiments are 10 to the 6th. One of the other references, Sodom uses 10 to the 6th. What Root says is disodium EDTA is ineffective. So it does not say from the hilltops, we found the solution right here. It says merely you should look at this further. When you turn to rad, rad has nothing to do with any type of catheters. Rad are pipes, water supply, totally different. It was filed 10 years after Root. And what does rad say? Title, abstract, field of the invention, summary, preferred embodiments and claims. You need the combination of an antibiotic or antimicrobial and a chelating agent. In fact, if you take a look at the figures, I think it's 1 to 4, what they show is that chelating agents themselves aren't only inhibitory, that they are sufficient to inhibit bacterial growth, but they don't kill everything. And as a result, what do they say? You need to have the addition of an antimicrobial and antibiotic. We do not use that combination. And you have to take rad for everything it teaches. So would you take and go from the water systems of rad and apply it to the catheters of Root? We don't believe so, Your Honor. And second of all, when you take a look at the chelators of rad, there's nothing that highlights tetrasodium from any of the others. In fact, the office goes to the preferred group of 12, but when you go to the most preferred of four, what is there? Disodium EDTA. Tetrasodium EDTA is not mentioned there. And if you take what Root says, Root says you've got to look at disodium further. And what rad says is there's essentially a bunch of chelators that are only inhibitory, and the most preferred, if you want to look at them, includes the disodium EDTA. Our invention is a stand-alone use of tetrasodium EDTA to do a full disinfection of conduits, particularly catheters. But doesn't rad disclose that tetrasodium EDTA is one of its 12 chelators? Yes, it does, Your Honor. But again, it does not exemplify it. The only ones that it does exemplify, I think, are the disodium EDTA and the calcium disodium EDTA. But as I read rad, it also teaches a combination, doesn't it? It requires the combination. The chelators are combined with antimicrobial combinations? Yes. That's a teaching, right, isn't it? It teaches the combination. In fact, it absolutely requires the combination. So 10 years after Root, rad comes along and says, in order to essentially finish the job, you need to have the addition of an antibiotic, an antimicrobial, in addition to the chelating agent. Our claims exclude the presence of that additional antimicrobial antibiotic. But if the chelators does include the tetrasodium EDTA. It does, Your Honor. There's no question about that. There's no question about that. Right, right. What's obvious? You're saying it's not obvious. We are saying, given the circumstances and what one of ordinary skill in the art would be taught by rad, you would not go to rad and say, I'm going to pick this one type of chelator from amongst all the others. Well, it's only 12 that he lists. 12 on the preferred, 4 on the most preferred. There are no, tetrasodium is not on the most preferred list. But tetrasodium is listed. Tetrasodium is listed, Your Honor. So it's not as if. But again, not in the context of a health care, a catheter. This is in pipes, water systems like that. Totally different concerns. Well, it teaches that the combination would control the bacteria microorganism, the growth of bacteria microorganism. The combination would. The combination of an antibiotic and a chelating agent. So it teaches that. Yes. Chelating agents in general, yes. And we are not covering our claims. And the office has recognized that our claims do not cover the combination of a chelating agent as well as an antibiotic. And there are significant reasons why. The combination. The combination. Not individually. Well, the combination, if you use an antibiotic for every one of your catheter flushes, what will happen is that bacteria will develop a resistance against that bacteria. Our test results to date have exhibited no resistance to the tetrasodium EDTA as a stand-alone agent, Your Honor. And that is a significant difference between what this invention can achieve and what the prior art teaches. Mr. Mukai, how does the tetrasodium EDTA in RAD function as an inhibiting agent? Well, Your Honor, again, there is no test of tetrasodium EDTA in RAD. RAD just gives you this laundry list of different materials, and the EDTA that is used is not tetrasodium EDTA. So when you take a look at those figures one to four, it says that EDTA is only inhibitory. But how does it inhibit? And isn't the answer that it inhibits by killing bacteria? Yes, Your Honor. It will kill some bacteria to a certain degree. So then what new use is reflected in the invention that's presented in your client's application? Again, we go to the fact that there is a world of difference between killing some and killing all. This is not a situation where you get... But in both cases, you're killing bacteria. Yes, Your Honor, that is true. It's not like you get to a certain level and all of a sudden something else happens. It's the same use, is it not? Well, it may or may not be the same mechanism, Your Honor. But, again, we want to stress ours is not a claim that says kill some or almost all. It means kill all of them. I realize that. But the question is whether it's a new use or not. Whether it's, as the Patent Office argues, it's just a better result, a newly discovered better result of the same use. And there is certainly a debate of semantics right here. But in our belief, Your Honor, is that a material that can kill everything is different than a material that can kill some. And I belabor to stress this point, but it's been hammered into me over the years that this application has been pending, that the company that is essentially investing in this has said, nobody has ever recognized that a tetrasodium EDTA alone can successfully kill all the bacteria in a catheter. And that is a remarkable development. When you take a look at Root, and Root says, consider looking at disodium, and then 10 years later Rad comes along, in fact, Sodom and the other prior art of record, they all talk about combinations of antibiotics and some other type of agent. And when you're talking about human health, this is not can you get a precipitation of a compound and 95% is good, but sure, you'd like to get 100%. There is a life and death difference between some and all. And that's what we are trying to say, Your Honor, is that you can't ignore that difference. The difference between inhibition and bactericidal can often be the difference between life and death. And what we're trying to do is we're trying to give the patients the best opportunity to survive here, to avoid that catheter-related infection that's prevalent throughout hospitals and the medical care profession. Okay. Let's hear from the office. Mr. Krauss. Thank you, Your Honor. May it please the Court? This is a very straightforward, obvious misprojection. There's a simple substitution of the disodium in ETA in Root with the tetrasodium in ETA in Rad. Rad teaches, essentially, that both of these disodium and tetrasodium EDTAs are chelators, and both Rad and Root describe the basic mechanism that chelators use in fighting and killing bacteria. Isn't there an argument here, though, that Rad teaches that the chelating agent alone won't suffice? Rad, for purposes of supporting Rad's claims, which involve the use of a chelating agent plus an antibiotic, certainly make that point. But throughout Rad, the entire point is that chelators alone do have an inhibitory effect on the growth of bacteria. They do kill bacteria, and it specifically says that. There's that section of the Board's CITES in Finding Effect 14 on 8473 of the Rad reference. Of course, Mr. Bukai is arguing that there's a difference between inhibiting and completely killing off the bacteria, and that one of ordinary skill in the art would not have appreciated from Rad that you could take tetrasodium EDTA alone and use it in the environment shown in Root to disinfect a catheter and achieve the result that he achieved. And I think that's based on what I think is a misapprehension that what's relevant is this final result of killing all the bacteria. Really, the invention here is a method of disinfecting a catheter using a certain substance. But is that right? It wasn't really clear from the Board's opinion whether they were saying that, in a sense, the claims go beyond what we're told is the invention, which is killing all bacteria, because there's nothing in the references to show that the disodium had that effect. Was the Board just complaining about the claims or saying that no matter what, even if your claims were limited to a concentration that killed all bacteria, it still would have been obvious? That line wasn't drawn, was it, in the Board's opinion? I think the Board was saying, look, we've got a method for disinfecting a catheter, and therefore it would have been obvious to use a known substitute for the disodium, use tetrasodium in place of the disodium, to achieve this disinfecting result. So we don't even need to reach the question whether or not all the bacteria is killed. If it's obvious to substitute tetra for dye, then you've got an obvious invention if the results happen to be. But if you have an unexpected result, then that is something that the law contemplates. The law contemplates that it be considered as a secondary consideration, an obviousness analysis. But here it's an unexpectedly beneficial result where the expected result is already going to be beneficial. You would expect that substituting one known chelate for another, both of which are known to kill bacteria, would continue to disinfect catheters. But is that really the law, that if you make a substitution and discover an unexpected benefit, that there's no way that that can be inured to the patentee so that the product is then developed? There may be some cases where that combination, where that use of that second substance, where once we see the unexpected properties, if they're so unexpected, something totally new and different like in the Adams Supreme Court case, where nobody would have expected this battery to work, then you look at the unexpected and say, OK, well that wasn't obvious. But is that what the board was saying? Again, it wasn't so clear that this isn't so unexpected that some other than the tetrasodium will have 100% bactericidal effect. They ultimately did end up looking at Exhibit A, the exhibit that purported to show these unexpected results, and said, well, we're not even sure these show unexpected results. And one reason you can look at that is the very first line of Exhibit A shows that both disodium and tetrasodium have exactly the same effect against S. epidermidis, the very bacteria that was used in root. That's on A300 of the appendix. That's their exhibit. Well, that's what I was trying to understand in the board opinion. Were they debating the evidence, or were they saying as a matter of law, assuming that you have made your case for significantly enhanced bactericidal effects of great, we're told, practical import, that you didn't prove it, or that in no circumstances could that be the basis of a patent? I think it's a combination of both. In the beginning, they're saying this is obvious because it's just a substitution and a method for disinfecting a catheter. At the very end, they say kind of what you just said, that Exhibit A doesn't even prove unexpected results. And one way to look at that, and I think this contradicts much of what was said. Or let's say it didn't prove superior results. Let's say there's nothing in the prior art to say that tetrasodium will kill more bacteria than disodium. Is that right? Nothing in the prior art, and also nothing even in Exhibit A that they're bringing forth in support of that proposition. And that's what's kind of interesting about something Mr. Mukai said. He repeatedly criticizes both now and in the brief the root reference as not being able to effectively control bacteria. If you look at Exhibit A, it suggests that less than 0.5 micrograms per milliliter of disodium itself will be effective to completely kill a bacterial population in a catheter. So whatever test they used to develop Exhibit A was certainly a different test than what was used in root, which they're now criticizing root for. No, but their claims require a concentration that's effective. The claims only require a concentration that's effective. And at this point, it's very hard to tell what that is. They don't put any concentration limits in their claims. And here the suggestion is even disodium EDTA would be effective at a very, very low concentration, much lower than the concentration that root suggests might not even be effective. I'm simply making the point that Exhibit A presents a very different picture than the picture presented by root itself. And I think the reason is different testing protocols were used to develop the evidence in Exhibit A versus the discussion in root. It's pretty clear, though, isn't it, from the RAD that EDTA is an inhibitor? So it's clearly an inhibitor. Yes. And that was a finding by the board. It was a factual determination as to what was disclosed by RAD. Yes. And there's very little evidence to offset that. I think Mr. Mukai conceded in front of you just now that, indeed, these various salts of EDTA are chelators and those have inhibiting effects, and that's taught clearly by RAD as well as root. I just wanted to ask you about the board's decision and the discussion about consisting essentially of, which I thought was a little unusual, and the board's statement, for example, about how appellants have not shown how including an antimicrobial agent would destroy the basic or novel characteristics of the claimed invention. And it goes on, in fact, it appears that adding an antimicrobial agent would enhance, not destroy. Somehow that analysis strikes me as being a little odd. Any comment? I tried to comment on that in the brief. I acknowledge it is a little bit confusing. I think what's important to remember is they started on that consisting essentially of analysis late in the board decision at page A23 where they were responding to a specific argument that the appellant had made in the appeal brief regarding teaching away. The appellant was suggesting that RAD would simply not be relevant, such that it was not even permissible to combine RAD with root, and that's what sort of led down to this path of what does consisting essentially of mean. And I acknowledge it gets confusing, but I guess I just point to where on A31 we say all the different places in the record where both the board and the examiner said the rejection here is a substitution of EDTA, the tetrasodium EDTA from RAD for the disodium EDTA in root, and the board reaffirmed that that was a rejection again on page A6 of the rehearing decision after going through that analysis of consisting essentially of EDTA. I guess the reason I bring it up is because we have from time to time, we get opinions from the board that have, shall we say, lots of good reasons and maybe some other statements that are perhaps not so good. And I realize you're in a little bit of a difficult position sometimes in having to defend the patent office, but under circumstances like that, it may be to your advantage to emphasize the things that are supportable and perhaps recognize that there are other parts of the board's decision that may not be the strongest and move on. Yes, and we did attempt to do that on page 31 of our brief where we said even if you interpret the board decision as saying something you disagree with, you can still affirm on the basis of all the different things the board did say. The data in the specification show, I think, reasonably clearly that at the same concentration the tetrasodium has an enhanced effect over the disodium and in the absence of a microbial agent as well, which may very well explain why the claims were written that way. I'm trying to understand the policy aspects. It seems to me that if I were on dialysis, I would rather have a bactericidal agent that killed more bacteria rather than less. I'm trying to understand if the principle is that unless there's a difference in kind, that a difference in degree can never establish a result sufficiently, I don't want to say unexpected, because perhaps one could expect that changes in a bactericidal agent will have different effects in the number of bacteria that they kill. But isn't there a point at which the policy purposes of the patent system are well met if there is a discovery of a beneficial result which is not predicted in the references? And where does one draw such a line? I definitely take your point. We want to reward invention, especially beneficial invention, but we can certainly draw the line somewhere far, far beyond this case. This case, we have a very well-known method for disinfecting catheters in the first place, and we've got a compound that has been established to work for disinfecting catheters. That's the bisodium EDTA. And I continue to take issue with Mr. Mukai's suggestion that there's this big difference between killing entirely and killing many. There is also, as the root reference makes clear, the catheter is going to be flushed several times a day using this solution. The Solomon reference that we don't rely on talks about the body's immune system also being able to take care of bacteria that are not necessarily taken care of by the antibacterial mechanisms you're using. So I guess what I'd like to say is this fits so clearly under what we learned from KSR that a known substitute is likely to be obvious in a known method. We've got the known method for disinfecting the catheter. We've got all these teachings saying chelators kill bacteria. That's not enough. Even if they kill slightly better, that's not going to be enough to get a patent. Perhaps if he had identified some very important range of concentration under which the killing would be particularly pronounced, then we'd have a different case and probably a different prior art as well. But this is simply the very broad claim for the use of tetrasodium EDTA in substitution for disodium EDTA where we've already got ample teaching that these are essentially known substitutes for each other. Are you looking at the public interest that the patent system serves? As a result, the public just won't have this product. It isn't as if it would be there unencumbered by patent. We don't really know that that's what would happen. I think part of the balance between the patent system is the dangers of overprotection versus underprotection. If the teaching is out there, and it's been out there since 1988, since the root reference that disodium EDTA can be used to clean catheters and chelates have antibacterial effects, then 10 years later, that's still 12 years ago from now, comes along the RAD reference and teaches us all this additional about chelators, it would seem perhaps a little counterintuitive now, as of the filing date of 2002 here, to give an additional monopoly based on the selection of one particular chelator out of a group of 12 that were already known to have this property. So I would submit that that would probably result in overprotection as a policy matter. Assuming the product would be available anyway. Assuming the product would be available. But perhaps after this decision, if it's sustained, such research wouldn't even be done? So we'd never know that there might be a 100% instead of a 98% bactericide available. Well, the root reference was not a patent whatsoever. That was an article in a medical journal. Articles in medical journals will continue to be written, presumably. Others will investigate the efficacy of tetrasodium EDTA. Maybe. Maybe. But if the patent system is foreclosed, perhaps the incentive is diminished. I concede the point. Okay. Any more questions? No. Mr. Mukai, you have a few minutes. Your Honors, I'll be very brief, particularly given the time of day it is. One of the things that we disagree with the offices is the breadth of the claims. These claims don't just say disinfecting. They specifically say that it's got to have a bactericidal effect. And there's been no dispute as to what that bactericidal effect means. It does mean kill everything. And that has kind of been washed aside, saying, well, I've got a reference group that kills some, and therefore I can make a simple solution and voila, I've got it. But there has been no recognition of killing everything in a catheter. But I didn't see in the board opinion that they said that by bactericidal effect, we construe that to mean 100%. If you look on page, I believe, 16 of the PTO brief, what they say on that page is that for purposes of this appeal, we are using Appellant's definition of bactericidal. And that is that it says, as used in Kite's claims, in contrast, bactericidal refers to killing an entire bacterial population, unless otherwise indicated. This brief follows Kite's definition of bactericidal. And for purposes of this appeal, perhaps, I'm not so sure that that's a claim construction, binding on the public at large. Well, yes, Your Honor. I mean, this particular definition is exactly what we're saying. This is that bactericidal effect is killing everything. As an aside, the Sodom in reference that was mentioned by the office, again, same time frame as the RAD reference. And what does it teach? Combination of antimicrobial and an auxiliary agent. So, again, even 10 years after the roof, they are still saying you need an antimicrobial, in this case, kind of an antibiotic there. So we think there is no prior art that recognizes that the tetrasodium EDTA, as a standalone agent, is effective in killing all the bacteria. And on that point, unless there are any further questions. Any more questions? Thank you very much, Your Honor. Thank you, Mr. McKay. Mr. Krauss, case is taken into submission. All rise. The honorable court is adjourned until tomorrow morning at 10 a.m.